UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SERVPRO INTELLECTUAL                                            Plaintiffs
PROPERTY, INC., and
SERVPRO INDUSTRIES, INC.,

v.                                          Civil Action No. 3:18-cv-00121-RGJ-CHL

JACOB BLANTON d/b/a                                            Defendants
WATER & FLOOD
CLEANUP RESTORATION and d/b/a
WWW.SERVPRO.CLICK, and
EMERGENCY SERVICES LLC,

* * * * *

## MEMORANDUM OPINION & ORDER

Plaintiffs, ServPro Intellectual Property, Inc. and ServPro Industries, Inc. (collectively "ServPro"), move for summary judgment. [DE 51]. Defendants, Jacob Blanton ("Blanton") and Emergency Services, LLC ("Emergency Services") (collectively "Defendants") responded. [DE 74]. The motion is ripe. For the reasons below, ServePro's Motion is **GRANTED in PART and DENIED in PART**.

### I.     Factual Background

ServPro is a residential and commercial cleaning, restoration, and remediation services company. [DE 51 at 1038]. ServPro has more than 1,700 franchisees operating nationwide, including in Louisville, Kentucky. [DE 1, ¶¶ 19, 42]. ServPro obtained federal trademark registrations for the SERVPRO word mark and variations of designs incorporating the SERVPRO word mark. [DE 51 at 1040]. Since at least 1969, ServPro has extensively marketed its products and services using the trademark SERVPRO, including extensive online marketing in which it requires its franchisees to use the ServPro marks and color scheme on all websites and internet

1

marketing.  [*Id.* at 1038, 1044; DE 1, ¶¶ 32–38].  The website for the Louisville franchise of ServPro is depicted below.



[DE 1, ¶ 38].

ServPro.'s trademarks include:

(1) Servpro Intellectual Property, Inc. is the owner of U.S. Trademark Registration No. 1,845,906 [DE 1, ¶22(a), Exh. 1] in connection with "carpet, furniture and drapery cleaning services, services for the restoration of structures and/or contents damaged by fire, water and other catastrophes both indoors and outdoors" for the trademark "SERVPRO."

(2) Servpro Intellectual Property, Inc. is the owner of U.S. Trademark Registration No. 3,361,893 [DE 1, ¶22(b), Exh. 2] in connection with "mold remediation services" for the trademark "SERVPRO."

(3) Servpro Intellectual Property, Inc. is the owner of U.S. Trademark Registration No. 1,707,245 [DE 1, ¶22(c), Exh. 3] in connection with "cleaning, painting and repairing services in homes, offices and other buildings" for the following mark:



(4) Servpro Intellectual Property, Inc. is the owner of U.S. Trademark Registration No. 1,726,156 [DE 1, ¶22(d), Exh. 4] in connection with "franchising services; namely, offering assistance in the establishment and/or operation of businesses dealing with cleaning and damage restoration to structures and/or contents" for the following mark:



(5) Servpro Intellectual Property, Inc. is the owner of U.S. Trademark Registration No. 1,804,022 [DE 1, ¶22(e), Exh. 5]. in connection with various cleaning products and equipment for the following mark:



(6) Servpro Intellectual Property, Inc. is the owner of U.S. Trademark Registration No. 3,368,163 [DE 1, ¶22(f), Exh. 6] in connection with "mold remediation services" for the following mark:



(7) Servpro Intellectual Property, Inc. is the owner of U.S. Trademark Registration No. 3,872,314 [DE 1, ¶22(g), Exh. 7] in connection with "Carpet, furniture and drapery cleaning services; restoration of building structures damaged by fire water and other catastrophes both indoors and outdoors; restoration of furniture damaged by fire, water and other catastrophes" for the following mark:



(8) Throughout its existence, and since 1967, Servpro has delivered its services in green trucks. Servpro Intellectual property, Inc. is the owner of U.S. Trademark Registration No. 3,847,298 [DE 1, ¶22(h), Exh. 8] for the mark "DESIGN OF GREEN VAN" in connection with "Carpet, furniture and drapery cleaning services; services for the restoration of structures and/or contents damaged by fire, water and other catastrophes."



Blanton owns a business that competes with ServPro called Emergency Services, a prior version of that business operated as RealPro. [DE 74 at 1541]. Emergency Services is an emergency mitigation and janitorial company, which operates in Louisville, Kentucky and the surrounding area. [*Id.* at 1542].

ServPro alleges that several times, including between January 21, 2017 and February 28, 2018, Blanton used its SERVPRO trademark in violation of the law. [DE 51 at 1041]. ServPro alleges that Blanton acquired "the domain name 'www.servpro.click' and advertis[ed] competing services on the Google search engine by incorporating the word SERVPRO into their advertisements, thereby inducing potential customers into contacting Defendants instead of Servpro." [*Id.* at 1038]. ServPro also alleges that the www.servpro.click domain name pointed to a website that contained a similar color scheme and layout of ServPro's website making it a "near-duplication of Servpro's standard franchisee Websites." [DE 1, ¶¶ 54–57]. Below is a screenshot of the allegedly infringing website.



[DE 1, ¶ 56].

In response, Blanton asserts that he bought Servpro.click along with several other domain names on November 15, 2017. [DE 74 at 1549]. He attached these domain names, including Servpro.click, to websites that went live on December 8, 2017. [*Id.* at 1550]. Blanton used ServPro, in advertisements on Google and "the Google Adword 'Servpro.click' ads were technically available from December 8, 2017 (the date the Servpro.click website went live) and January 3, 2018 (the last date the ads ran)." [*Id.*]. Yet, Blanton claims that "the ads were only actually run for approximately six (6) days because of the expense and because the true purpose was merely to obtain data to explore ways to expand ES's business through the use of various domains in conjunction with lead generator platforms and generic web pages." [*Id.*].

ServPro claims that Blanton's use of the ServPro.click domain name, its website, and the term ServPro in Google advertisements enticed customers searching for ServPro to engage Blanton

and his company for services instead of ServPro. [DE 51 at 1038]. In support of this allegation, ServPro attached six declarations from former customers or potential customers of Emergency Services, which describe their purported confusion as to Blanton's use of ServPro's mark, including in some cases their belief that the services were being provided by ServPro. [DE 51-4– 51-9]. ServPro claims $915,017.22 in lost revenue because of customer confusion related to the website and Blanton's other allegedly infringing activity. [DE 51 at 1056].

Blanton disputes the veracity of these declarations. He asserts that five out of six declarants failed to pay for services rendered by Emergency Services. [DE 74 at 1552–53]. He also asserts that four of the declarants' statements are objectively false because the timing of their allegations does not match the times the allegedly infringing advertisements were available or the times the website they claim to have viewed was operational. [*Id.*]. Blanton offers website and phone call activity records to show that "not a single person clicked on the ads, visited the websites or called the phone line associated with Servpro.click on the days these individuals say they did." [*Id.* at 1553; 74-10; 74-11; 74-16].

Blanton also asserts that contrary to ServPro's allegations, no one from Emergency Services ever claimed affiliation with ServPro and the website linked to the ServPro.click domain name never purported to be ServPro's website. [*Id.* at 1564–65]. He claims that neither he nor Emergency Services ever obtained a customer from the use of ServPro's trademark. [*Id.* at 1553].

## II. Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate if the

moving party shows that there is no genuine issue of material fact about an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435–36. The moving party has the burden of proving conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" if proof of that fact could establish or refute an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*

Once the moving party carries the initial burden of proving that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson,* 477 U.S. at 256, 106 S. Ct. 2505. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S. Ct. 2505 (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S. Ct. 2505.

## III.    Discussion

The Complaint asserts multiple claims relating to Defendants' infringing activities, including trademark infringement under 15 U.S.C. §1114 and 15 U.S.C. §1125, unfair competition, cyber piracy, counterfeiting, and conspiracy. [DE 1]. The claim of unfair competition tracks trademark infringement and therefore Servpro only intends to seek its claim of unfair competition if the claim of trademark infringement fails. [DE 51 at 1039 (citing *Delta Air Lines, Inc. v. Influence Direct, LLC*, No. 3-14-0926, 2016 WL 310068, at *2 (M.D. Tenn. Jan. 15, 2016))]. As a result, Servpro seeks summary judgment on its trademark infringement, cybersquatting, and conspiracy claims.

### A.  Trademark Infringement

To establish a claim for trademark infringement, ServPro must show that it had a valid, protectable trademark, Blanton used the trademark in commerce, and the use was likely to cause confusion. *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (internal citations omitted). Blanton concedes the first two elements. [DE 74 at 1563]. As a result, the parties only contest whether Blanton's use of the ServPro mark was likely to cause confusion. [*Id.*].

In determining whether use of a mark was likely to cause confusion, the Court weighs eight factors: "(1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing of channels used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion in selecting the mark."

*Audi AG v. D'Amato*, 469 F.3d 534, 542–43 (6th Cir. 2006). The eight factors "imply no mathematical precision, . . . and not all of these factors may be particularly helpful in any given case. . . . The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) (citation omitted).

"Any dispute about the evidence that pertains to the eight factors presents a factual issue. . . . In contrast, the further determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion." *Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 427 (6th Cir. 2017) (internal citations and quotations omitted). Thus, "[t]o resist summary judgment in a case where the likelihood of confusion is the dispositive issue, a nonmoving party must establish, through pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, that there are genuine factual disputes concerning those Frisch's factors which may be material in the context of the specific case." *Id.*

Here, while not conceding any factors, the only factors Blanton addresses in his response are actual confusion and whether he intended to use ServPro's trademark. [DE 74 at 1563 ("Defendants do not address the strength of Servpro's mark, the relatedness of the services provided, the similarity of the marks, or the marketing channels used. . . [because] the Court should afford these factors little, if any, weight in the likelihood of confusion analysis.")]. Because no one factor is dispositive, the Court will examine each factor.

*1. Strength of ServPro's Mark*

A "mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." *JTH Tax, Inc.*

*v. Freedom Tax, Inc.*, No. 3:19-CV-00085-RGJ, 2019 WL 2062519, at *5 (W.D. Ky. May 9, 2019) (quoting *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985)). ServPro asserts that its mark is strong because it is distinctive and subject to wide commercial use. [DE 51 at 1043–45]. ServPro's mark on its face does more than just describe "the intended purpose, function or use of the goods; the size of the goods; the class of users of the goods; a desirable characteristic of the goods; or the end effect upon the user." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190 (6th Cir. 1988). As a result, it is not merely descriptive. The record also demonstrates that ServPro's mark has wide commercial use as it has been used for over 50 years in a multitude of advertisements, including "all websites, internet advertising, radio ads, vehicles, billboards, print advertising, television ads, and even business signage and office documents." [DE 51 at 1044]; *JTH Tax, Inc.*, 2019 WL 2062519, at *5 ("the Court measures a mark's commercial strength by whether it has been subject to wide and intensive advertisement") (internal citations omitted).

As Blanton presents no evidence or argument to suggest that there is a disputed issue of material fact about the strength of ServPro's mark and the record supports a finding that the mark is strong, the Court finds this factor supports finding likelihood of confusion.

### 2. *Relatedness of the Goods*

This factor looks at whether the business of the holder of the trademark and the alleged infringer are similar because "[w]here 'the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar.'" *EAT BBQ LLC v. Walters*, 47 F. Supp. 3d 521, 530 (E.D. Ky. 2014) (quoting *Daddy's*, 109 F.3d at 282). "Cases generally fit into one of three categories regarding the relatedness of the goods and services of the parties. First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive,

the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely." *Daddy's*, 109 F.3d at 282. Goods and services are related if "the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Id*. at 282–83 (citing *Homeowners Group v. Home Marketing Specialists*, 931 F.2d 1100, 1109 (6th Cir.1991)).

The record shows that both businesses operate in the same industry and offer similar cleaning and remediation services. [DE 51-3 at 1274:1–1279:25; DE 51-3 at 1296–99]. As the parties have presented no issues of material fact on the relatedness of the services offered and the record demonstrates that the parties are competitors, this factor supports finding likelihood of confusion.

### 3. Similarity of the Marks

"Similarity of marks is a factor of considerable weight." *Daddy's*, 109 F.3d at 283. A side-by-side comparison of the marks is not appropriate, although the commonalities of the respective marks must be the point of emphasis. *Id*. And "courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc*., 679 F.3d 410, 421 (6th Cir. 2012) (citing *Daddy's*, 109 F.3d at 283). As a result, courts must view the "marks in their entirety and focus on their overall impressions, not individual features." *Daddy's*, 109 F.3d at 283 (citations omitted).

"In situations where the marks are identical, there is almost never a dispute regarding confusion." *EAT BBQ*, 47 F. Supp. 3d at 530. The Sixth Circuit has noted that "[c]ases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. Such cases are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement." *Wynn*, 839 F.2d at 1190–91 (quoting 4 McCarthy on Trademarks and Unfair Competition § 23:20 (4th ed.)).

Blanton has offered no evidence to dispute that he used a mark identical to ServPro's trademark or that he and ServPro are direct competitors. [DE 74 at 1563]. His admissions in his deposition, the use of ServPro's trademark in the domain name, and the visual similarities in his advertisements[1] and ServPro's support both. [DE 51-3 at 1274:1–1279:25; DE 51-3 at 1296–99; DE 1, ¶¶ 22, 50–56]. Some courts have found that when, as here, the marks are identical, and the goods or services are competitive, finding a strong likelihood of confusion is "open and shut." *Wynn*, 839 F.2d at 1190–91. As a result, as there are no material facts in dispute, this factor weighs strongly in ServPro's favor.

4. *Actual Confusion*

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Wynn*, 839 F.2d at 1188. That said, "it does not follow that lack of evidence of actual confusion should be a significant factor. . . . this fact does not preclude this Court from concluding that there

---

[1] Blanton asserts in his Response that the website connected to the allegedly infringing domain name was blue and orange, which differed from ServPro's standard green and orange colors. [DE 74 at 1565]. However, in his deposition, Blanton admitted that his website had a green and orange color scheme. [DE 51-3 at 1268:13–69:20]. The Court need not accept unsupported facts asserted in an affidavit if they contradict earlier given deposition testimony and the contradiction is not explained. *See Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x 347, 353 (6th Cir. 2013) ("Because [the plaintiff] was asked specific questions about, yet denied knowledge of, the material aspects of her case, the material allegations in her affidavit directly contradict her deposition."); *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012) (noting the rule is that a party opposing summary judgment with an affidavit that contradicts her earlier deposition must explain why she disagrees with herself).

is a 'likelihood of confusion', as actual confusion is merely one factor to be considered by the Court when it makes its determination." *Id.* (citation omitted).

Blanton asserts that the evidence of actual confusion put forth by ServPro is not credible and accurate. In support, he offers several pieces of evidence to counter ServPro's declarations, namely evidence establishing that the dates asserted in ServPro's declaration differ from the dates Blanton's advertisements and websites were operational and website and phone call records showing no activity occurred on the infringing website and advertisements on the dates alleged. [DE 74 at 1552–53, 1564; 74-1, ¶¶ 80, 81, 86; 74-5; 74-10; 74-11; 74-16][2]. He also asserts that five out of the six declarants have liability exposure to Defendants because they did not timely pay for their services. [DE 74 at 1552–53]. The Court finds that the counter evidence put forth by Blanton creates a genuine issue of material fact as to whether there is evidence of actual confusion.

Thus, taking the facts in the light most favorable to Blanton, the Court will disregard ServPro's evidence of actual confusion. That said, even if the Court assumes that there is no evidence of actual confusion, this cannot create a genuine issue of material fact as to likelihood of confusion. Instead, without any evidence of actual confusion the Court weighs this factor neutrally. *See Atria Senior Living Grp., Inc. v. Best W. Int'l, Inc.*, No. CIV. A. 3:09CV-557-H, 2009 WL 3756994, at *2 (W.D. Ky. Nov. 9, 2009) ("because absence of actual confusion is not required to find a likelihood of confusion, this factor is neutral"); *Nat'l K-9, Inc. v. Nat'l Canine Assoc., Inc.*, No. 2:09-CV-608, 2009 WL 10679476, at *4 (S.D. Ohio Dec. 10, 2009) (where "no

---

[2] The Court notes that Westerfield's declaration states that she visited the allegedly infringing website and made a phone call to Blanton "around December 30, 2017." [DE 51-7 at 1310]. Still, Blanton only provided call records and website analytics from December 31st through January 2nd. [DE 74-10; 74-11]. That said, Gifford's declaration asserting that he called Blanton on December 18, 2017, [DE 51-8 at 1316] is disputed by Blanton's call records reflecting no calls for that day, [DE 74-16].

actual evidence was presented, however, the Court will consider this factor as neutral in its weighing of all eight factors").

　　*5. Marketing of Channels Used*

　　Courts consider the respective marketing channels of the parties to an infringement action to determine "how and to whom the respective goods or services of the parties are sold." *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006) (citation and internal quotations omitted). "[I]f the services of one party are sold through different marketing media in a different marketing context than those of another seller, the likelihood that either group of buyers will be confused by similar service marks is much lower than if both parties sell their services through the same channels of trade." *Homeowners Grp., Inc.*, 931 F.2d at 1110. Put differently, "[t]here is less likelihood of confusion where the goods are sold through different avenues." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*., 502 F.3d 504, 519 (6th Cir. 2007).

　　Given that today, most businesses advertise online "[a] plaintiff cannot show a likelihood of confusion by generally alleging that both parties market their goods through the Internet or social media." *Tailgate Beer, LLC v. Boulevard Brewing Co*., No. 3:18-CV-00563, 2019 WL 5208186, at *9 (M.D. Tenn. Oct. 16, 2019). So to consider whether an overlap in online marketing denotes a likelihood of confusion, Courts ask three questions: "First, do the parties use the internet as a substantial marketing channel? . . . Second, are the parties' marks used with web-based products? . . . Third, do the parties' marketing channels overlap in any other way?" *Kibler v. Hall*, 843 F.3d 1068, 1079 (6th Cir. 2016)

　　While ServPro uses many types of advertising, it asserts that it extensively markets its services online. [DE 51 at 1047–48]. ServPro asserts that it uses the "SERVPRO Word Marks on all its websites, including franchisee websites, and uses the word in the Servpro website domain

name (servpro.com). [And that] Servpro and its franchisees purchase Google Ads and bid on the word SERVPRO when potential consumers search for Servpro on Google and other search engines." [DE 51 at 1048]. Similarly, Blanton describes his extensive use of online marketing, which includes Google ads and a domain name using the word ServPro. [DE 74 at 1541–50]. Neither party provided evidence or argument related to the last two factors. ServPro does not alleged that Blanton advertised using the ServPro mark other than through the internet, and based on the services offered by both companies it does not appear that they offer web-based services. Both these factors favor Blanton. There is thus no material factual dispute about the overlap of the parties' marketing channels, and the only alleged overlap relates to online marketing. For that reason, "[t]he marketing channels factor is neutral because there is minimal evidence that the parties' advertising methods or targeted customers substantially overlap beyond shared use of [internet advertising.]" *Kibler*, 843 F.3d at 1080.

### 6. Discerning Customers

In determining the level of consumer interest, Courts apply a "typical buyer exercising ordinary caution" standard to assess the level of consumer interest. *Leelanau Wine Cellars, Ltd*, 502 F.3d at 519 (internal citation and quotations omitted). In determining if this level of discernment is appropriate the Court examines whether consumers possess "special expertise or are sophisticated purchasers," or are "purchasers of more expensive products," both of which can suggest consumers are more likely to exercise care and reduces the likelihood of confusion. *Id.* ServPro argues that the Court should apply an even lesser standard because the typical ServPro customer is experiencing a catastrophic event, and therefore, would spend even less time assessing its service provider. [DE 51 at 1049]. As a result, "consumers are less discerning and are more susceptible to infringement." [*Id.*].

However, the customer affidavits put forth by ServPro offer limited support for this proposition. Only one of the affidavits suggests that the customer was "in distress" and did not exercise the ordinary "due diligence in vetting" her service provider. [DE 51-6 at 1307, ¶ 4]. Additionally, two of the six affidavits describe professionals, including a manager of an apartment complex and a manager of American Red Cross, purchasing services on behalf of the company for whom they worked. [DE 51-7; 51-8]. Further, the law typically presumes that customers engaging in expensive purchases, including those for repair, will spend more time researching the service provider, which denotes a higher level of concern. *See Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 510 (6th Cir. 2013) (finding greater discernment in purchase of "expensive industrial products that are not likely to be purchased without substantial care and research" because of the expense of the products) (listing cases establishing that the greater the expense of the product the greater the care of the customer). Here, according to ServPro's damages claim, the customers who allegedly were misled spent over $1,000, some tens of thousands of dollars. [DE 51 at 1056; 51-4 ($4,000 paid by Deloris Dunbar; DE 51-5 ($1,000 paid by Heather Evans); DE 51-6 ($14,000 paid by Jackie Powell); DE 51-9 ($896,017.22 paid by the American Red Cross)]. However, Courts also recognize that "Internet users do not undergo a highly sophisticated analysis when searching for domain names." *PACCAR Inc. v. TeleScan Techs.*, L.L.C., 319 F.3d 243, 253 (6th Cir. 2003), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 125 S. Ct. 542, 160 L. Ed. 2d 440 (2004).

On balance, given the expense of the services and the fact that at least some of the customers are professionals engaging services on behalf of their companies, and taking the facts in the light most favorable to Blanton, a lower level of customer care is not appropriate. In any event, ServPro has cited no authority to support the proposition that the Court should reduce the

level of customer confusion under these circumstances, and the Court has found none. As a result, the Court will apply the "typical buyer exercising ordinary caution" standard to assess the level of consumer interest. This factor weighs in Blanton's favor.

### 7. Intent of Blanton in Selecting the Mark

Courts have held that "[i]f a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 799 (6th Cir. 2004) (quoting *Homeowners Grp.*, 931 F.2d at 1111). Yet, "where the copying is deliberate, even if the intent to confuse is not, 'purposeful copying indicates that the alleged infringer ... believes that his copying may divert some business from the senior user.'" *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 797 (6th Cir. 2015) (quoting *Daddy's*, 109 F.3d at 286). "[T]he *presence* of intent can constitute strong evidence of confusion. . . . The converse of this proposition, however, is not true: the *lack* of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source." *Daddy's*, 109 F.3d at 287 (internal quotations omitted) (emphasis in original).

Blanton chose ServPro.click intentionally. [DE 74-1, ¶ 15]. Blanton asserts that he operated the ServPro domain name and used it in advertising because it was a recommended search term in this industry. [DE 51-3 at 1265:1–16 ("So, and they said that they had good data supporting that the word Servpro would work to create cold calls, so we purchased Servpro.click and attached a domain to it"). Blanton asserts he used the ServPro term to get data for his lead generator service. [DE 74-1, ¶¶ 17–18]. The parties dispute whether Blanton's motives also included intentionally confusing customers into using Emergency Services instead of ServPro. [*Compare* DE 74 at 1569–70 *with* DE 51 at 1049–50]. Yet that dispute is immaterial, because by Blanton's own admission, he intentionally chose to use the ServPro mark because the term had a record of

increasing website traffic. [DE 74-1, ¶¶ 17–18]. Thus, neither party disputes that his intent in choosing ServPro was to generate traffic to his website, and using the ServPro mark in this way reflects a likelihood of confusion. As a result, this factor supports a likelihood of confusion.

### 8. Likelihood of Expansion

"[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Daddy's*, 109 F.3d at 287 (quoting *Homeowners Group*, 931 F.2d at 1112) (citing Restatement of Torts § 731(b) & comment c (1938)). "A finding that the parties will not expand their markets significantly, however, 'does not address' the ultimate issue of likelihood of confusion." *Id.* (quoting *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1122 (6th Cir. 1996)). "Thus, . . . a negative finding is *not* a strong indication to the contrary." *Id.* (citing *Champions Golf Club, Inc.*, 78 F.3d at 1122) (emphasis in original). Additionally, when the two parties' products directly compete with each other, "the likelihood [of expansion of product lines] is already a reality." *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 604 (6th Cir. 1991) (citation and internal quotation marks omitted).

Here, the Court has already found that ServPro and Emergency Services overlapped in their internet marketing and offered similar services. Additionally, while ServPro suggests that Emergency Services' business could expand to overlap further with its own, [DE 51 at 1050], neither party offers any evidence that Emergency Services is likely to expand to further overlap with ServPro services. Thus, because the services offered already directly compete and ServPro has offered no specific evidence that Emergency Services will further expand and overlap with its business "the last 'Frisch's' factor is not relevant." *La Bamba Licensing, LLC v. La Bamba Authentic Mexican Cuisine, Inc.*, 295 F. Supp. 3d 756, 770 (W.D. Ky. 2018) (where "the evidence

does not show that the possibility of Plaintiff expanding near Defendant's restaurant is 'strong,' the last 'Frisch's' factor is not relevant."). Thus, this factor remains neutral.

### 9. Balancing of Factors

Most of the factors in this case weigh in favor of finding that there is a likelihood of confusion. Blanton has only offered evidence disputing one factor, whether there was actual confusion. However, even taking the evidence in the light most favorable to Blanton, the majority of the factors support a likelihood of confusion. As a result, the Court finds that no reasonable jury could find that there was not a likelihood of confusion. ServPro's trademark infringement claim is granted.[3]

### B. Cybersquatting

ServPro also brings claims under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), which protects among other things a company from cybersquatting. "'[C]ybersquatting' occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004). To establish a cybersquatting claim, ServPro must show that: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit. *See id*. "The last element does not simply require a finding of bad faith, . . . but

---

[3] ServPro asserts that if it "prevails on its infringement claim, it intends to waive its counterfeiting claim." [DE 51 at 1039]. Thus, the Court will dismiss its Counterfeiting claim.

a bad faith *intent* to profit." *Am. Univ. of Antigua Coll. of Med. v. Woodward*, 837 F. Supp. 2d 686, 693 (E.D. Mich. 2011) (internal citation omitted) (emphasis in original). Here, the only factor remaining in dispute is whether Blanton acted with a bad faith intent to profit. [DE 74 at 1568].

"An analysis of whether a defendant's actions constitute bad faith within the meaning of the ACPA usually begins with consideration of several factors, nine of which are listed in the ACPA."[4] *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004). That said, "[t]he factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit." *Id.* at 811.

ServPro asserts that factors I through V, and IX weigh in its favor and argues without citation that factors VI through VIII should be disregarded as irrelevant. [DE 51 at 1052]. As to factors I through IV, and IX, ServPro argues that "Defendants registered and used a domain name that was identical to Servpro's mark – www.servpro.click – but Defendants do not own the

---

[4] (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source sponsorship, affiliation, or endorsement of the site;
(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false contact information when applying for registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of [the act].

SERVPRO mark." [*Id.*].  They also assert that "Defendants have no bone fide prior use of the SERVPRO mark and no other legal right to use the SERVPRO Word Marks in a trademark way; Defendants received multiple warning letters from Servpro advising them of Servpro's rights." [*Id.*].

Blanton offers no evidence or argument regarding factors I through IV, and IX.  As Blanton has offered no evidence to demonstrate a genuine dispute as to these factors, and the record supports ServPro's assertion, [DE 1-2, 1-3, 1-4, 1-5, 1-6, 1-7, 1-8; 51-1 at 1070, ¶ 19] the Court finds that there is no genuine dispute about these factors and they weigh in favor of ServPro.

As to factors VI through VIII, Blanton asserts that he "did not attempt (let alone had the intent) to offer or sell the 'servpro.click' domain name to Servpro; provide any false or misleading information when registering for the domain name; or acquire multiple domain names that are identical or confusingly similar to the SERVPRO mark. In fact, Defendants purchased several other domain names that were in no way similar to the SERVPRO mark."  [DE 74 at 1569]. ServPro offered no evidence in support of these factors.  The Court finds that there is no genuine dispute about factors VI through VIII, and that they weigh in favor of Blanton and against a finding of bad faith.

That said, there is genuine dispute regarding factor V.  Blanton asserts that he did not "purchase the 'servpro.click' domain name with the intent to divert customer away from Servpro for its own commercial gain."  [DE 74 at 1570].  He alleges instead that he did so in order "to collect information and perform analytical research on the domain names with an eye towards testing consumer responses to various domain names in conjunction with specific key word searches when running Google AdWords advertisements."  [*Id.*].  He also alleges that the website the domain name pointed to did not advertise that it was ServPro, and the contact information on

22

the website pointed to his personal cellphone.  [DE 74 at 1565; DE 51-3 at 1273:13–25].  Blanton alleges that when answering calls made to that number, he identified himself as affiliated with Emergency Services and never identified himself as affiliated with ServPro.  [*Id.*].

Given Blanton's assertions and weighing the evidence in the light most favorable to Blanton, the Court finds that there is a genuine dispute about whether Blanton bought ServPro.click with bad faith intent to profit from the misuse of the domain name.  Thus, taking the facts in the light most favorable to Blanton, the Court cannot find that no reasonable jury would find for Blanton and summary judgment on the cybersquatting count is denied.

## C. Conspiracy

ServPro alleges that "Blanton and Emergency Services have participated in a civil conspiracy, so the bad acts of one should be attributed to the other."  [DE 51 at 1053].  ServPro alleges that "they combined their efforts to conduct trademark infringement for the purpose of deceiving customers into thinking they are Servpro."  [*Id.*].

ServPro's conspiracy claim fails as a matter of law because it alleges that the only conspirators were Blanton and his company Emergency Services.  "It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy."  *Upton v. City of Royal Oak*, 492 F. App'x 492, 504 (6th Cir. 2012).  Similarly, "[a] corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."  *Id.*  ServPro has offered no evidence to suggest that Blanton was acting outside his role as Emergency Services' agent when he bought ServPro.click or engaged in any other alleged infringement.  Thus, no reasonable jury could find that Defendants conspired to commit trademark infringement and ServPro's conspiracy count is dismissed.

D. Damages[5]

*1. Injunctive Relief*

"A plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted, and that it is in the public's interest to issue the injunction." *Audi*, 469 F.3d at 550 (internal citations omitted). "[G]enerally, irreparable injury, the first factor, is presumed from a showing of success on the merits of a trademark infringement claim." *Deere & Co. v. FIMCO Inc.*, 302 F. Supp. 3d 837, 903 (W.D. Ky. 2017), superseded in part, 301 F. Supp. 3d 704 (W.D. Ky. 2018). And the possibility for continued use of the infringing mark establishes that "there [i]s potential for future harm, and therefore, there [i]s no adequate remedy at law." *Id.* (citing *Audi*, 469 F.3d at 550). As to the third factor, weighing of harm, Blanton appears to agree that an injunction is appropriate and does not suggest that he would be harmed by an injunction. [DE 74 at 1566–67]. "Fourth and finally, the Sixth Circuit has explained that '[i]t [i]s in the public's interest to issue the injunction in order to prevent consumers from being misled.'" *Deere & Co.*, 302 F. Supp. 3d at 904 (quoting *Audi*, 469 F.3d at 550). Each of these factors supports awarding injunctive relief. As a result, the Court will grant an injunction permanently enjoining Defendants from using ServPro's trademark. Defendants, as well as their officers, agents, employees, attorneys, affiliates, and all others in active concert or participation with them, are enjoined and restrained from:

1.      Using and/or registering any domain name that includes SERVPRO and/or any term likely to create confusion with SERVPRO and/or any of Servpro's trademarks;

2.      Engaging in any conduct that infringes the SERVPRO Marks;

---

[5] Because the Court denied summary judgment on ServPro's cybersquatting claim, it will not address damages as they relate to that claim.

3. Offering any goods or services using any mark containing the phrase "SERVPRO" or any variation or similar mark;

4. Engaging in any advertising that falsely or misleadingly associates Defendants' goods or services with Servpro or Servpro's goods or services;

5. Using "SERVPRO" or any derivations thereof in any search engine optimization scheme, program, or efforts, including Google AdWords and similar applications, or as metadata; and furthermore

6. Defendants, in accordance with 15 U.S.C. § 1116, shall file a verified report with this Court within thirty (30) days of the Court's entry of the order for injunctive relief, specifying in detail the manner and form in which Defendants have complied with the injunction and order of this Court.

### 2. *Lanham Act Damages*

While the appropriateness of injunctive relief can be decided on summary judgment, monetary damages cannot. Injunctive relief is designed to "arm[] the holder with a legal weapon by which it can fend off infringing use. In contrast, monetary damages are designed to compensate the victim for lost sales, to rectify unjust enrichment or to deter future use." *Maker's Mark Distillery, Inc.*, 703 F. Supp. 2d at 700. The Lanham Act provides that a plaintiff who succeeds on an infringement claim "shall be entitled ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. 1117(a). "The statute says a prevailing plaintiff is 'entitled' to damages, but qualifies that directive with the language 'subject to the principles of equity.'" *Maker's Mark Distillery, Inc.*, 703 F. Supp. 2d at 703 (quoting 15 U.S.C. 1117(a)). The Sixth Circuit has determined that the

"Court could properly deny monetary damages where, . . . there is neither harm to the plaintiff nor gain or willful infringement by the defendant." *Id.*

Blanton has asserted that Emergency Services "**did not generate any business or acquire any customers through the 'servpro.click' website,**" and Google Analytics "shows that Servpro was not harmed in any monetary fashion by the domain name."  [DE 74 at 1567 (emphasis in original)].  ServPro asserts that they are owed $915,017.22 in damages, which it bases on loss of business attributable to the affiants who provided declarations.  [DE 51 at 1055].  As the Court has already discussed, Blanton has asserted a genuine doubt as to the accuracy of the accounts in those declarations.  It is premature for the Court to award any monetary damages in this case.  As a result, the Court will deny ServPro's motion to the extent that it seeks summary judgment on monetary damages.

### 3. Attorney's Fees

Under 15 U.S.C. § 1117(a), the Court may award reasonable attorney's fees to the prevailing party in "exceptional" cases.  15 U.S.C. § 1117(a).  In determining whether to award attorney's fees, the Court conducts a two-part inquiry: "(1) whether [ServPro] was a prevailing party, and (2) whether this case was exceptional."  *Audi*, 469 F.3d at 550 (internal quotations omitted).  That ServPro was entitled to injunctive relief from its trademark infringement claim, satisfies the first element, that it is the prevailing party.  *Id.*

Even so, "a case is not exceptional unless the infringement was malicious, fraudulent, willful, or deliberate."  *Id.* (internal citation and quotations omitted).  Here, there is a genuine dispute of material fact as to whether Blanton's conduct was "malicious, fraudulent, willful, or deliberate."  ServPro asserts that Blanton acted willfully because he affirmatively represented to

customers that he was affiliated with ServPro and because after receiving ServPro's cease and desist letters, Blanton continued to violate ServPro's trademark. [DE 51 at 1056–58].

While Blanton fails to address whether attorney's fees are appropriate, he does dispute the factual basis for finding willfulness. First, Blanton asserts that he never represented that he was providing services on behalf of ServPro. [DE 74 at 1565]. Second, Blanton asserts that he never received the cease and desist letters ServPro purportedly sent. [*Id.* at 1551 n.3].

The evidence here, taken in the light most favorable to Blanton, shows that there is a genuine issue of material fact as to whether Blanton acted willfully and thus whether this is an "exceptional" case permitting the awarding of attorney's fees. As a result, the Court will deny ServPro's motion on award of attorney's fees.

E. Counterclaims

ServPro also moves to dismiss Blanton's counterclaims for defamation and unfair competition. [DE 51 at 1061]. Blanton failed to address these arguments in his Response. Blanton was granted significant extensions of time to file his Response. [DE 67, 72]. "This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). Because Blanton failed to address or provide any support for his counterclaims in his Response, the Court concludes Blanton has abandoned these claims, and they are dismissed.

IV.    **Conclusion**

For these reasons, having considered the above motion and being otherwise sufficiently advised, the Court **GRANTS in PART and DENIES in PART** ServPro's Motion for Summary Judgment [DE 51]. The Court further **ORDERS** that Defendants, in accordance with 15 U.S.C. §

1116 and the injunction issued in this Order, shall file a verified report with this Court within thirty (30) days of the Court's entry of this Order, specifying in detail the manner and form in which Defendants have complied with the injunction and order of this Court.